WATERLOOV GUTTER PROTECTION SYSTEMS CO., INC., Plaintiff,

v.

ABSOLUTE GUTTER PROTECTION, L.L.C., Charles Knight, William Gumpper, Gumpper's Gutter Service, Ray Vandergrift, Nelson Sensenig, individually and as agent of Sensenig Spouting and White Oak Mfg., L.L.C., Defendants,

v.

Richard L. Kuhns, Charles Lee Thomason, Raymond R. Moser, Jr., Emon J. Wall, and Thomason & Moser, Additional Counterclaim Defendants.

Civil Action No. 97–2554.

United States District Court, D. New Jersey.

Sept. 28, 1999.

Robert F. Zielinski, Jacob C. Cohn, David E. Landau, Catherine L. Sakack, Wolf, Block, Schorr and Solis–Cohen LLP, Camden, NJ, for Plaintiff, Waterloov Gutter Protection Systems Co., Inc. and Additional Counterclaim Defendant Richard L. Kuhns.

Norman E. Lehrer, Vanitha M. Elgart, Norman E. Lehrer, P.C., Cherry Hill, NJ, for Defendants, Absolute Gutter Protection, L.L.C. and Charles Knight.

Michael J. Canning, Giordano, Halleran & Ciesla, P.C., Middletown, NJ, for Additional Counterclaim Defendants, Charles Lee Thomason, Raymond R. Moser, Jr., Emon J. Wall, and Thomason & Moser.

## OPINION

ORLOFSKY, District Judge.

This case began as a relatively straightforward patent infringement dispute between two rain gutter manufacturers. Plaintiff, Waterloov Gutter Protection Co., Inc. ("Waterloov"), manufactures and sells a patented device that directs rain water

into a roof gutter while preventing leaves and other debris from falling into and clogging the gutter. It alleges that Defendant Charles Knight ("Knight"), through his company, Absolute Gutter Protection, L.L.C. ("Absolute"), makes and markets a gutter essentially identical to Waterloov's.

The scope of the case broadened considerably, however, when Knight and Absolute (collectively "Defendants") filed an answer with counterclaims. Four of these counterclaims allege wrongdoing not only on the part of Waterloov, but also by Waterloov's attorneys. The first counterclaim alleges that Waterloov and its attorneys engaged in acts of unfair competition by sending letters to Absolute's customers notifying them that they were infringing Waterloov's patents by purchasing Absolute gutters. The other three counterclaims relate to a failed business venture involving Knight, Waterloov's president and owner, Richard L. Kuhns ("Kuhns"), and one of Waterloov's attorneys, Raymond R. Moser, Jr. ("Moser"). Knight alleges that Kuhns and Moser induced him to invest $16,000 in the start-up of Waterloov International Corporation ("WIC"), a company established to market Waterloov gutters in foreign countries, even though Kuhns and Moser knew that Waterloov gutters were ineligible for foreign patent protection. Based upon that scenario, the Defendants filed counterclaims for common law fraud, violations of the New Jersey Consumer Fraud Act, and attorney malpractice. Moser and Waterloov's other attorneys, Charles Lee Thomason ("Thomason"), Emon J. Wall ("Wall"), and the law firm of Thomason & Moser (collectively "Attorney Defendants"), have filed a motion for summary judgment on all four counterclaims. Two of the four counterclaims raise novel issues of law involving the application of a state-law litigation privilege in a federal question case and whether New Jersey's Consumer Fraud Act governs the conduct of the Attorney Defendants in this case.

Knight and Absolute's unfair competition claim requires this Court to decide whether New Jersey's litigation privilege, a state-law privilege, is preempted by federal law in a federal question case. Specifically, I must determine whether New Jersey's "absolute litigation privilege" protects attorneys who send notices of patent infringement to third parties when federal law permits liability to be imposed for the transmittal of such demand letters on a showing of bad faith. Because the application of New Jersey's "absolute litigation privilege" in this case does not conflict with a federal interest or undermine a federal right and given New Jersey's strong policy interest in the privilege, I hold that the litigation privilege is not preempted under the circumstances of this case. As a result, Knight and Absolute cannot assert an unfair competition claim against the Attorney Defendants, based solely on the Attorney Defendants' demand letters. Accordingly, I will grant the Attorney Defendants' motion for summary judgment on the unfair competition claim.

The Defendants' New Jersey Consumer Fraud Act ("CFA") claim requires the Court to address the applicability of the CFA to attorneys as well as investments in start-up companies. I find that under New Jersey law attorneys are not *per se* excluded from liability under the CFA. Rather, a determination of whether the CFA applies to any professional requires a weighing of various factors, including an evaluation of the applicable standards governing the conduct of the professional. I need not address whether the CFA applies to the attorneys in this case, however, because I conclude that the CFA is not applicable to investments in start-up companies. Consequently, I will grant the Attorney Defendants' motion for summary judgment on the CFA claim.

I will deny the Attorney Defendants' motion for summary judgment on the common law fraud claim. I find that a genuine material question of fact exists as to whether Moser knew or should have known that Waterloov's gutters are ineligible for foreign patent protection. I also find that a material question of fact exists as to whether Moser made any representa-

tions to Knight about foreign patent availability and whether Knight relied on any such representation.

Finally, I will grant the Attorney Defendants' motion for summary judgment on the attorney malpractice claim. Under New Jersey law, a party alleging attorney malpractice must provide expert witness testimony to establish the duty of care against which the attorney's actions are to be measured. Because the Defendants have not provided sufficient expert testimony and because the standard of care applicable to this case is not so basic or obvious that expert testimony is unnecessary, the Attorney Defendants are entitled to summary judgment.

## I. Factual and Procedural History

Some of the procedural and factual history of this case has already been recounted in this Court's opinion in a related action. *See Thomason v. Lehrer,* 182 F.R.D. 121, 123–24 (D.N.J.1998). What follows below describes the facts and procedural history relevant only to the summary judgment motion currently before the Court.

On May 16, 1997, Waterloov filed a Complaint alleging patent infringement by Absolute and Knight, Absolute's owner. In particular, Waterloov alleged infringement of United States Patent No. 4,411,-110 (the " '110 patent"), of which Waterloov is the exclusive licensee. *See* Compl. ¶¶ 7, 9–11 (dated May 15, 1997).

According to a Declaration submitted by Kuhns, Knight once sold Waterloov products as an authorized dealer and manufacturer representative. *See* Kuhns Decl. ¶ 7 (dated May 14, 1997). Knight terminated this relationship in a letter to Kuhns in 1996. *See id.* at ¶¶ 7–8. Kuhns alleges that Knight then went into business for himself, manufacturing, marketing and selling "Gutter ProTech," a gutter Kuhns claims infringes the '110 patent. *Id.* at

¶¶ 5–6. Kuhns further accuses Knight of co-opting Nelson Sensenig ("Sensenig"), a onetime supplier of gutter components to Waterloov and a successful former Waterloov dealer, into an exclusive supplier-dealer relationship with Absolute. *See id.* at ¶¶ 9, 13, 15. Finally, Kuhns asserts that Knight lured Ray Vandergrift ("Vandergrift"), another former Waterloov dealer, into the Absolute stable. *See id.* at ¶¶ 18.

Waterloov amended its Complaint on July 16, 1997, joining Sensenig and Vandergrift as Defendants, *et alia. See* Am. Compl. ¶¶ 4, 6 (dated July 15, 1997). Waterloov noted in the Amended Complaint that it had sent letters, dated March 20, 1997, to Sensenig and Vandergrift, giving them notice of their infringement. *See id.* at ¶ 27.

Absolute and Knight filed an Answer, Affirmative Defenses and Counterclaims in response, denying Waterloov's allegations and asserting claims for declaratory relief. In Count I of their Answer, Affirmative Defenses and Counterclaims, they demanded that the '110 patent be declared invalid and uninfringed. *See* Answer, Affirmative Defenses and Counterclaims Ct. I (dated July 29, 1997) (hereinafter "Answer I"). They also sought declaratory judgments that Patent Nos. 5,216,851 and 5,339,575 ("the '851 patent" and "the '575 patent") were invalid, unenforceable, and uninfringed. *See id.* Cts. II–III. These patents relate to the same general technical area as the '110 patent, rain gutter covers and roof line protectors. *See id.* at ¶ 60; Att'y Defs.' Br. Supp. Summ. J. at 2 (filed Feb. 26, 1999).

Absolute and Knight also asserted Counterclaims against a number of parties who had not yet been joined to the action: Kuhns and the Attorney Defendants, Thomason, Moser, Wall, and Thomason & Moser (hereinafter collectively "Additional Counterclaim Defendants"). *See id.* at ¶¶ 46–51.[1] Count IV of these Counter-

---

1. Thomason was Waterloov's counsel until he was forced to withdraw because of the obvious conflict created by being named as a Counterclaim Defendant. *See* Letter Opinion

of The Honorable Robert B. Kugler, United States Magistrate Judge (dated May 20, 1998). Thomason and Moser are partners at Thoma-

claims accused Waterloov and the Attorney Defendants of unfair competition for having sent the above mentioned letters to Sensenig and Vandergrift, *et alia,* threatening enforcement of their rights in the '575 and '851 patents. *See id.* at ¶¶ 75–78.

Waterloov filed a motion to sever and dismiss the claims asserted against the Additional Counterclaim Defendants, and in an Unpublished Opinion and Order, this Court granted the Plaintiff's Motion with respect to three of the Defendants' nine Counterclaims, finding that because they were directed exclusively at the Additional Counterclaim Defendants and not at all at the Plaintiff, the Additional Counterclaim Defendants could not be properly joined pursuant to Rules 13(h), 19, and 20 of the Federal Rules of Civil Procedure. *See* Op. and Order (dated Mar. 31, 1997). These dismissed Counts alleged common law fraud, violations of the New Jersey Consumer Fraud Act, and legal malpractice. *See* Answer I Cts. VII–IX. They were predicated on the same factual allegations: Knight accused the Additional Counterclaim Defendants of inducing him to invest $16,000 in the start-up of WIC even though they knew or should have known that because Waterloov products had been sold to and used by the public prior to October 23, 1991, they would never be eligible for foreign patent protection. *See id.* at ¶¶ 89–101. The three Counterclaims were dismissed without prejudice. *See* Op. and Order.

On April 3, 1998, Absolute and Knight amended their Answer, Affirmative Defenses and Counterclaims without leave of Court, asserting all of the same Counterclaims they had previously alleged but taking care to name Waterloov in all counts. *See* First Amended Answer, Affirmative Defenses and Counterclaims Cts. VII–IX (filed Apr. 3, 1998) (hereinafter "Answer II"). Absolute and Knight were plainly trying to overcome the Rule 13(h), 19, and 20 difficulties that triggered the dismissal

of these three Counterclaims just four days earlier.

The Attorney Defendants filed an Answer to Absolute and Knight's First Amended Answer on April 24, 1998. They demanded that Counts VII–IX be dismissed with prejudice for having been improperly interposed, but answered all other allegations and claims. *See* Answer to Counterclaim and Affirmative Defenses of Counterclaim Defendants Charles Lee Thomason, Raymond R. Moser, Jr., Emon J. Wall, and Thomason & Moser ¶ 5 (filed Apr. 24, 1998) (hereinafter "Answer to Counterclaim"). Despite having sent a letter to this Court giving notice of their intent to submit a dispositive motion, ostensibly to dismiss Counts VII–IX, *see* Letter of Charles Lee Thomason (dated Apr. 24, 1998), such a motion was never filed.

On January 26, 1999, Waterloov filed a Second Amended Complaint, adding allegations that the Defendants, Sensenig, and Vandergrift, *et alia,* infringed the '575 and '851 patents in addition to the '110 patent. *See* Second Am. Compl. ¶¶ 2–10, 16–19 (dated Jan. 25, 1999). Allegations concerning the '851 patent were voluntarily dismissed by Waterloov two weeks later. *See* Notice of Dismissal of Count III of Second Am. Compl. (dated Feb. 9, 1999).

On February 22, 1999, after the Attorney Defendants had filed their papers in support of their motion for summary judgment, the Defendants filed an answer to Waterloov's Second Amended Complaint. *See* Answer, Affirmative Defenses and Counterclaims (filed Feb. 22, 1999) (hereinafter "Answer III"). Answer III differed significantly from the Defendants' predecessor answers. Specifically, Wall was omitted from all counts, Thomason was alleged to be vicariously and not personally liable on all Counts, and the law firm of Thomason & Moser was stricken from Counts VII–IX (although they remained named in Count IV on a theory of vicarious liability) and the law firm of Tho-

son & Moser, and Wall is an associate at the firm. *See* Answer at ¶¶ 48–51.

mason & Spalding was substituted in its stead. *Compare* Answers I and II ¶¶ 75–78, 88–101 *with* Answer III ¶¶ 174–180, 190–207.

Counts IV and VII–IX of Defendants' Counterclaims are the subject of the Attorney Defendants' pending motion for summary judgment.

## II. Preliminary Matters

### A. *Jurisdiction*

#### (1) *Count IV: Unfair Competition*

 This Court has original jurisdiction over Counterclaim IV.[2] "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the ... patent ... laws." 28 U.S.C. § 1338(b) (1994). A patent claim is "substantial" if, on the basis of the pleadings, it is not frivolous or lacking in substance. *See Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 564 F.Supp. 1358, 1373 (D.Del.1983); *General Foods Corp. v. Struthers Scientific & International Corp.,* 297 F.Supp. 271, 274 (D.Del.1969); *Jenn–Air Products, Co. v. Penn Ventilator,* 283 F.Supp. 591, 595 (E.D.Pa.1968). A patent claim is "related" if it is derived from a common nucleus of operative fact. *See General Foods Corp.,* 297 F.Supp. at 275. The term "related" is to be interpreted broadly. *See Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 587 F.Supp. 1112, 1114 (D.Del.1984).

 There is no question that Defendants Absolute and Knight have alleged a substantial patent claim. Counts II and III of their Answer allege that the '851 and '575 patents are invalid, unenforceable and not infringed and have been filed in response to Waterloov's infringement suit concerning the same patents. Count IV is, moreover, related to Counts II and III. Count IV alleges unfair competition on the ground that letters sent by the Attorney Defendants to Sensenig's and Vandergrift's customers threatening enforcement of the '851 and '575 patents had no purpose but to "disrupt and interfere with Absolute's business and to gain an unfair economic advantage for Waterloov." Answer II ¶ 76. Count IV is related to Counts II and III because the validity and enforceablity of the '851 and '575 patents will be critical in determining whether the Attorney Defendants' letters were sent solely to secure an unfair competitive advantage over Absolute. Count IV, in other words, arises out of a common nucleus of operative fact: the validity and enforceability of the '851 and '575 patents. Thus, jurisdiction over Count IV may be properly exercised under 28 U.S.C. § 1338(b).

#### (2) *Counterclaims VII–IX: Common Law Fraud, New Jersey Consumer Fraud Act Violations, Attorney Malpractice*

This Court may also exercise jurisdiction over Counts VII–IX, although on a different ground.[3] Jurisdiction cannot be predicated upon 28 U.S.C. § 1338(b) as Defendants argue, *see* Answer III ¶ 151, because

---

**2.** This Court exercised jurisdiction over Count IV in its March 31 Opinion. Because "[t]he issue of whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation," *United Mine Workers v. Gibbs,* 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Beach v. KDI Corp.,* 490 F.2d 1312 (3rd Cir.1974); *Valente v. PepsiCo,Inc.,* 454 F.Supp. 1228, 1255 (D.Del.1978); *General Foods Corp. v. Struthers Scientific & International Corp.,* 297 F.Supp. 271, 277 (D.Del.1969); *see also Rounseville v. Zahl,* 13 F.3d 625, 631 (2nd Cir.1994); *Salei v. Boardwalk Regency Corp.,* 913 F.Supp. 993, 999 n. 3 (E.D.Mich.1996), I

briefly revisit the basis for the exercise of jurisdiction over this counterclaim here.

**3.** In its March 31, 1997, opinion dismissing Counterclaims VIIIX, this Court did not reach the question of federal jurisdiction over these claims. *See* Op. and Order. Because Defendants' failure to name Waterloov as a Counterclaim Defendant presented such an obvious obstacle to joinder, it was unnecessary to do so. I must now address the question of jurisdiction as well as whether Defendants' amendment naming Waterloov as a Counterclaim Defendant in Counts VII–IX renders joinder proper.

Counts VII–IX do not constitute claims of unfair competition. Counts VII–IX accuse the Attorney Defendants of common law fraud, violations of the New Jersey Consumer Fraud Act, and negligence. The essence of each of these claims is that Waterloov and the Additional Counterclaim Defendants induced the Defendants to invest in and become part owners of an international start-up company, Waterloov International Corporation ("WIC"), established to market Waterloov products abroad even though they knew or should have known that it would be impossible to secure foreign patent protection. It is difficult to see how these claims fit within the rubric of unfair competition. Courts have characterized many different types of claims as claims of unfair competition. *See, e.g., O'Brien v. Westinghouse Elec. Corp.*, 293 F.2d 1 (3rd Cir.1961) (accusation charging the misappropriation of trade secrets treated as a claim for unfair competition); *Hook v. Hook & Ackerman, Inc.*, 233 F.2d 180 (3rd. Cir.1956) (copying the appearance of another's patented product construed to be a claim for unfair competition); *General Foods Corp. v. Struthers Scientific & International Corp.*, 297 F.Supp. 271 (D.Del.1969) (allegations that defendant wrongfully appropriated information from the plaintiff and used that information to secure two patents characterized as claims for unfair competition); *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 250 F.Supp. 926 (E.D.Pa.1966) (false statements by defendant that plaintiff's invention was his own formed basis for unfair competition claim). Nonetheless, there is scant evidence that courts are willing to characterize claims essentially alleging fraud as claims for unfair competition.

■ Jurisdiction must be found elsewhere, and given that diversity[4] jurisdiction does not exist between the parties and that Counts VII–IX do not raise federal questions, 28 U.S.C. § 1367 is the only potential basis for jurisdiction.[5] Before this Court can determine whether supplemental jurisdiction applies to Counts VII–IX, however, it must first address the pivotal question of whether Counts VII–IX should be characterized as compulsory or permissive counterclaims. As the Third Circuit has indicated:

> It is stated frequently that the determination of ancillary jurisdiction of a counterclaim in federal court must turn on whether the counterclaim is compulsory within the meaning of Rule 13(a).... What is meant is that the issue of the existence of ancillary jurisdiction and the issue as to whether a counterclaim is compulsory are to be answered by the same test. It is not a coincidence that the same considerations that determine whether a counterclaim is compulsory decide also whether the court has ancillary jurisdiction to adjudicate it. The tests are the same because Rule 13(a) and the doctrine of ancillary jurisdiction are designed to abolish the same evil, viz., piecemeal litigation in the federal courts.

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 633–34 (3rd Cir. 1961); *see also Phillips Petroleum Co. v. United States Steel Corp.*, 566 F.Supp. 1093, 1096–97 (D.Del.1983).

A counterclaim is compulsory if "it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a). Courts have held that the Rule 13 standard is satisfied when a "logical relationship" can be established between a counterclaim and one of the claims brought by the opposing party. *Great Lakes Rubber*

**4.** All parties are citizens of New Jersey for diversity purposes.

**5.** Section 1367 states, in relevant part:
[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
28 U.S.C. § 1367 (1994).

*Corp.*, 286 F.2d at 634. Several factors should be considered in evaluating whether a logical relationship exists, including whether separate trials of the different claims would involve a substantial duplication of effort and time and whether the claims and counterclaims involve many of the same factual and legal issues or factual and legal issues that are offshoots of the same basic controversy. *See id.; see also Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059–60 (3rd Cir.1978). "'Transaction or occurrence' should be interpreted broadly; it is unnecessary that the facts be from the same time or that exactly the same facts will resolve the issues in the complaint and the counterclaim." *Centennial School District v. Independence Blue Cross*, 885 F.Supp. 683, 685 (E.D.Pa.1994); *see also Metallgesellschaft AG v. Foster Wheeler Energy Corp.*, 143 F.R.D. 553, 558 (D.Del.1992). Finally, the "logical relation" inquiry is a fact-intensive, case-specific one, resisting the categorization of different couplings of claims and counterclaims as necessarily compulsory or permissive, *see Xerox Corp.*, 576 F.2d at 1060, although "[a]ny counterclaim involving the same patent as involved in the original action usually is considered to arise from the same transaction as the main claim." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1410, at 73 (2nd ed.1990).

This Court is satisfied that Counts VII–IX are compulsory counterclaims. In Count II of its Second Amended Complaint, Waterloov asserts that the '575 patent is valid and has been infringed by the Defendants. The Defendants counter that they have not infringed the '575 patent because the '575 patent is invalid. They claim that gutters embodying the '575 patent were advertised and sold to the public more than a year before Waterloov filed an application for United States patent protection—a fact that, if true, would render the patent invalid for failing to meet the novelty requirements of United States patent law. *See* 35 U.S.C. § 102 (1994).[6] Central to a determination of the validity of the '575 patent is an assessment of when, if at all, gutters embodying the '575 patent were put to an invalidating public use.

While it is true that Counts VII–IX of Defendants' counterclaims raise a substantial number of factual and legal issues quite distinct from those raised by Waterloov in its Second Amended Complaint, i.e., Waterloov's Complaint does not mention WIC at all, it is also true that these Counts raise "novelty" issues concerning the '575 patent: Defendants Absolute and Knight allege that foreign patents could never have been obtained for Waterloov gutters because gutters embodying the '575 patent were advertised and sold to the public before Waterloov filed for United States patent protection—a violation of foreign novelty requirements.[7] Central to a determination of the eligibility of Waterloov gutters for foreign patent protection will be an examination of precisely when gutters embodying the '575 patent were first in public use in the United States. Thus, the same central factual question is raised by both the Plaintiff's claim and the

**6.** Section 102 states, in pertinent part:
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . . .
35 U.S.C. § 102.

**7.** While United States patent law permits an invention to be used or sold or described in a printed publication for a year preceding a patent application without novelty being sacrificed, *see* 35 U.S.C. § 102(b), most foreign countries require "absolute novelty," i.e., that an invention not be used or sold publicly or described in a printed publication at any time prior to the filing of a patent application. *See* Ryan Beard, Comment, *Reciprocity and Comity: Politically Manipulative Tools for Protection of Intellectual Property Rights in the Global Economy*, 30 Tex. Tech. L.Rev. 155, 161 (1999).

Defendants' counterclaims: When was the invention embodying the '575 patent first used publicly, sold publicly, or described in a printed publication? Consequently, both the Plaintiff's claims and the Defendants' counterclaims are logically related in that they have in common a critical factual question the resolution of which in one litigation saves this Court and the parties from the needless duplication of effort and time in a second lawsuit.

A decision to label a counterclaim as compulsory is a decision to exercise supplemental jurisdiction over that counterclaim pursuant to 28 U.S.C. § 1367. The only question that remains, then, is whether, the Defendants, given their amendment to their counterclaims, have properly joined the Attorney Defendants. I conclude they have.

Rule 13 permits persons not made parties in an original action to be joined for the purposes of a counterclaim if they meet the requirements set forth in Rules 19 and 20. *See* Fed.R.Civ.P. 13(h). Rule 20 states that parties may be joined as defendants "if there is asserted against them ... any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact in common to all defendants will arise in the action." Fed.R.Civ.P. 20(a). Courts have interpreted Rule 20(a) to establish a two-part test and require both parts to be met for joinder to be permitted: First, claims brought against defendants to be joined must stem from the same transaction or occurrence, and, second, they must share a common question of law or fact. *See Morris v. Paul Revere Insurance Group*, 986 F.Supp. 872, 885–86 (D.N.J.1997); *Dougherty v. Mieczkowski*, 661 F.Supp. 267, 277–78 (D.Del.1987); *Mesa Computer Utilities, Inc. v. Western Union Computer Utilities, Inc.*, 67 F.R.D. 634, 636 (D.Del.1975). Courts have held that the first prong of this test requires an inquiry identical to the "logical relation"

inquiry under Rule 13(a). *See Dougherty*, 661 F.Supp. at 278; *King v. Pepsi Cola Metropolitan Bottling Co.*, 86 F.R.D. 4, 5–6 (E.D.Pa.1979). Counts VII–IX easily satisfy these joinder requirements. The Defendants are seeking relief against the Attorney Defendants on the same basis they are seeking relief against Waterloov. They claim that the Attorney Defendants, like Waterloov, either knew or should have known that the inventions produced from the '575 patent had been publicly disclosed in a way that would prevent WIC from ever obtaining foreign patents for the Waterloov gutter protection system. Because identical transactions, questions of law, and questions of fact are at issue for all of the Additional Counterclaim Defendants, joinder of the Attorney Defendants is proper.[8]

### B. *The Defendants' Amendment of Their Answer, Affirmative Defenses, and Counterclaims*

Counsel for the Attorney Defendants contends that the Defendants amended their answer and counterclaims improperly because they did not first seek leave of court. *See* Answer to Countercl. ¶ 5; Att'y Defs.' Br. Supp. Summ. J. at 1. The Defendants respond by characterizing their initial omission of Waterloov from their counterclaims as a mere "clerical error." Defs.' Mem. Opp'n Summ. J. at 2 (filed Feb. 26, 1998).

The Defendants' amendment was permissible. "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). A motion to dismiss is not a responsive pleading within the meaning of Rule 15. *See Hewlett–Packard Co. v. Arch Assoc. Corp.*, 172 F.R.D. 151, 153 (E.D.Pa.1997) (citing Fed. R.Civ.P. 7(a)); *Schnabel v. Bldg. & Construction Trades Council of Phila.*, 563

---

**8.** Because I conclude that joinder is permitted pursuant to Rule 20(a), I need not reach the question of whether joinder of the Attorney Defendants is necessary under Rule 19.

F.Supp. 1030, 1035 (E.D.Pa.1983). Courts have held generally that a party may amend its pleading without seeking leave of court after the pleading has been dismissed, as long as the amendment is made within a reasonable time and no responsive pleading has been served. *See id.* (citing 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 1483 & n. 19 (1990) (citing cases)).

In *Hewlett–Packard,* three defendants, described collectively in the opinion as the "Jewell Defendants," filed an answer with counterclaims in response to a complaint by Plaintiff Hewlett–Packard ("HP"). *See id.* at 152. The court dismissed the Jewell Defendants' counterclaims without prejudice. *See id.* Fifteen months after their counterclaims had been dismissed and after a long and contentious discovery process, the Jewell Defendants filed an amended answer with counterclaims without seeking leave of court. *See id.* The counterclaims were "essentially the same" as those filed initially, except that they added an additional counterclaim under the Robinson–Patman Act and omitted two others. *Id.* HP immediately filed a motion to dismiss or strike the amended answer and counterclaims. *See id.* at 153. The court held that the Jewell Defendants should have sought leave of court because 15 months had passed between the dismissal of their original counterclaims and the filing of their amended counterclaims. *See id.* Finding that Rule 15 "requires parties to litigate their cases diligently and serves the interest of finality," the court ruled that it would have undermined these interests to have permitted an amendment as a matter of course under those circumstances. *See id.*

The circumstances in *Hewlett–Packard* are strikingly similar to the circumstances in this case, with a notable exception, which compels me to reach a different conclusion. Here, as in *Hewlett–Packard,* the Defendants filed a counterclaim that was dismissed without prejudice and later sought to amend their answer by re-alleging "essentially the same" counterclaims without seeking leave of court. Moreover, the amendments in both cases were made before a responsive pleading had been made.

In the instant case, however, the Defendants filed their amended counterclaims within days of the Court's dismissal.[9] Consequently, there is no risk that the interests in diligent litigation and finality outlined in *Hewlett–Packard* would be sacrificed if, in this case, Defendants' amended answer and counterclaims were found to be permissible pursuant to Rule 15(a). Nor have the Additional Counterclaim Defendants in this case faced the degree of prejudice HP would have faced had the amended counterclaims been permitted in that case. Had the Jewell Defendants' amendment been allowed, HP would have had to complete months more of discovery. *See id.* at 154–55. In this case, the Additional Counterclaim Defendants were served with the amended counterclaims shortly after having briefed the question of whether the original counterclaims should have been dismissed. They had the opportunity to avoid the additional discovery they had to perform. They could have filed a motion to dismiss, however, they never did so. Rather, they waited until this motion for summary judgment was filed months later to raise the issue. Accordingly, I find that the Defendants' April 3, 1998, amended answer with counterclaims was proper even if filed without leave of court.[10]

---

9. This case is also different from *Hewlett–Packard* in that the Defendants have amended their counterclaims by adding a party while the Jewell Defendants in *Hewlett–Packard* amended their counterclaims by adding a claim. I see little reason why this difference is meaningful in any significant way.

10. Because the case law in this area can be somewhat confusing, a few additional clarifying notes may be helpful. One might read the *Hewlett–Packard* opinion to stand for the proposition that a party wishing to amend a pleading after the pleading has been dismissed must necessarily seek leave of court. Indeed, the court in *Hewlett–Packard* states

C. *Defendants' Final Answer, Affirmative Defenses and Counterclaims (Answer III)*

The final matter this Court must consider before turning to the merits of Defendants' motion for summary judgment concerns the variances that exist between the Defendants' Answer III and their predecessor answers. The Attorney Defendants contend that Defendants' Answer III amounts to a voluntary dismissal of all Counts against Thomason and Wall personally and of Counts VII–IX against the law firm of Thomason & Moser. *See* Att'y Defs.' Reply Br. at 1–2 (filed Feb. 26, 1999). They would like to reserve the right to address the Court by separate motion as to the terms and conditions of the dismissal of these claims. *See id.*

■■■ If Defendants Knight and Absolute had moved for a voluntary dismissal pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, it would be well within the discretion of this Court to grant such a dismissal. Except where a plaintiff has filed a notice of dismissal prior to an answer or motion for summary judgment or where all parties have entered into stipulation of dismissal, "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(1)-(2). "The purpose of this rule is to prevent voluntary dismissals that would prejudice opposing parties," *Pennsylvania Food Merchants Ass'n v. O. Houstoun,* 999 F.Supp. 611, 618 (M.D.Pa.1998), and courts have generally followed the principle that dismissal should be allowed unless defendant will suffer some plain legal prejudice. *See United States v. Eighteen Various Firearms,* 148 F.R.D. 530, 531 (E.D.Pa.1993) (stating that threat of a second lawsuit is not such a prejudice). The Defendants in this case have not filed a motion to dismiss, however, and have indicated no desire to do so. In their brief they construe any differences between Answer III and predeces-

that "[i]t is generally held ... that once a motion to dismiss has been granted, a plaintiff may amend its pleading only by leave of the court," despite citing Charles A. Wright, Arthur R. Miller, and Mary Kay Kane's *Federal Practice and Procedure* just paragraphs later for just the opposite position. *Id.* at 153. Further analysis of both the *Hewlett–Packard* opinion and the case law upon which it relies reveals that there are two critical inquiries in deciding whether a pleading can be amended without leave of court after a dismissal. Leave must be sought if a final judgment has been entered in addition to the order of dismissal or if a substantial period of time has elapsed after the dismissal. *See id.* at 153 (citing 6 Wright, Miller & Kane, *supra* § 1483 & n. 19 (citing cases)); *see also* Fed.R.Civ.P. 54 (stating that when more than one claim for relief is presented in an action, including counterclaims, the court may direct the entry of a final judgment as to any one of them individually but only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment). If there has been a final judgment then leave to amend must be sought pursuant to the requirements of Federal Rules of Civil Procedure 59(b) and (e) and 60. *See Kelly v. Delaware River Joint Comm'n,* 187 F.2d 93, 94–95 (3rd Cir.1951). In this case, as was true in *Hewlett–Packard,* there has been no entry of final judgment. Consequently, the Court need only look to whether a substantial period of time elapsed between the dismissal and the filing of the amended counterclaims. In this case, unlike *Hewlett–Packard,* a substantial period of time had not passed.

There is also discussion in the case law of Rule 13's bearing on amendments involving counterclaims. Rule 13 addresses the plight of the "omitted counterclaim," stating that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of the court set up the counterclaim by amendment." Fed.R.Civ.P. 13(f). Cases involving the application of this rule have generally grown out of a party's failure to plead a counterclaim altogether at its first opportunity and/or a party's failure to meet Rule 15(a)'s requirements for amendments as matters of course. *See, e.g., Architectural Coatings Assoc. Ltd. Partnership v. Applied Coatings Int'l, Inc.,* 103 F.R.D. 442 (E.D.Pa.1984); *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.,* 50 F.R.D. 415 (D.Del.1970); *Fischer & Porter Co. v. Haskett,* 287 F.Supp. 831 (E.D.Pa.1968). Rule 13 is inapplicable here where the amendments have been made to counterclaims that were pled at the Defendants' first opportunity to plead them and satisfy the Rule 15 requirements.

sor answers as mere rewordings, meant "to clarify certain issues and to make changes to reflect information that has been learned through discovery since the Counterclaims were first imposed." *See* Defs.' Mem. Opp'n Summ. J. at 2–3. Admittedly, where a pleading rewords a party right out of an action—as is the case with Wall—the line between "clarification" and "dismissal" becomes a fine one. Nonetheless, I shall not construe the variances between Defendants' final and predecessor answers as a dismissal, especially where both parties have litigated the merits of the underlying claims extensively, the Court is able to render decisions on the merits, and neither party has briefed the question of what terms of dismissal should be imposed if the Court were to dismiss the claims and/or parties.

This being said, however, summary judgment is granted in favor of Wall as to all claims because the Defendants have not opposed the Attorney Defendants' motion for summary judgment as it relates to him.

> When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). The same is true for Thomason, at least to the extent to which he has been sued "personally," because he still appears to be subject to liability on a theory of respondeat superior on all claims.

The law firm of Thomason & Moser has been replaced by the law firm of Thomason & Spalding on all Counts but Count IV. It appears that at the time the facts relevant to Counts VII–IX occurred Thomason & Moser was not the firm that represented Waterloov. On Counts VII–IX, then, this Court shall grant summary judgment as these claims pertain to Thomason & Moser.

Having addressed these preliminary matters, I will now consider the merits of the Attorney Defendants' motion for summary judgment.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

"On a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Abraham v. Raso,* 183 F.3d 279, 285 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)). "Any factual dispute invoked by the nonmoving party to resist summary judgment must be both material in the sense of bearing on an essential element of the plaintiff's claim and genuine in the sense that a reasonable jury could find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In opposing summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence. *Abraham,* 183 F.3d at 285. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *see also Abraham,* 183 F.3d at 285. "Thus, while the nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party." *Abraham,* 183 F.3d at 285 (citing *Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 393 (3d Cir.1998)). "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Id.*

If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey,* 873 F.2d 17, 21 (1st Cir.1989)). Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed. R.Civ.P. 56(e); *see Anchorage Assocs.,* 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movants only if they are entitled to a judgment as a matter of law. *See Anchorage Assocs.,* 922 F.2d at 175.

## IV. DISCUSSION

### A. *Count IV: Unfair Competition*

Defendants Absolute and Knight allege that the Attorney Defendants engaged in acts of unfair competition by sending letters to Sensenig and Vandergrift alleging infringement of the '851 and '575 patents. The Attorney Defendants seek summary judgment, offering three arguments: (1) The letters were sent in good faith and within the Plaintiff's rights under the patent laws; (2) Absolute incurred no damage as a result of the transmittal of the letters; and (3) the letters cannot form the basis of an unfair competition claim because they are protected under New Jersey's "absolute litigation privilege." *See* Att'y Defs.' Br. Supp. Summ. J. at 20–29 (filed Feb. 26, 1999).

■ For the reasons that follow, I conclude that the Attorney Defendants are entitled to summary judgment on the ground that New Jersey's "absolute litigation privilege" is applicable to the letters sent by the Attorney Defendants to Absolute's customers.[11] This Court is satisfied both that it has the power to apply the litigation privilege to Absolute's unfair competition claim and that, once applied, the privilege insulates the Attorney Defendants from liability for any claim of unfair competition. Without these letters—the core of Count IV's allegations—no factual dispute remains, and the Attorney Defendants are entitled to judgment as a matter of law.

This Court's power to apply a state-law privilege to a pendent state-law counterclaim in a federal question case derives from the evidentiary rules governing federal civil cases. Rule 501 of the Federal Rules of Evidence provides in relevant part:

[T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, *in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.*

Fed.R.Evid. 501 (emphasis added). It cannot be disputed that Absolute and Knight's claim for unfair competition is a state-law claim to which state law supplies the rule of decision. *See Dynamic Instrument Corp. v. Fedtro, Inc.,* 266 F.Supp. 848, 851 (E.D.N.Y.1967) (holding that when allegations of patent infringement are made in bad faith a tort law claim arises "under state law but not patent law"); *see also Trio Process Corp.,* 250 F.Supp. at 928 (characterizing claim against defendant for making false allegations of patent infringement as a "nonfederal" claim). Consequently, this Court has the power to determine any privilege the Attorney Defendants might assert against

---

11. Because I grant summary judgment on this ground, I need not reach the Attorney

Defendants' other arguments in support of their motion for summary judgment.

this claim in accordance with New Jersey law.

While this conclusion may seem obvious, decisions concerning the application of privileges are not generally so simple. Indeed, a great deal of confusion surrounds the application of state-law privileges in cases arising under a District Court's federal question jurisdiction. *See* Jack B. Weinstein & Margaret A. Berger, 3 *Weinstein's Federal Evidence* §§ 501.02[2][b]-[c] (Joseph M. McLaughlin, ed., Matthew Bender 2 ed.1997). Courts have approached the application of state-law privileges in such cases differently, with many courts asserting a preference against the application of state-law privileges. *See, e.g., Harding v. Dana Transport, Inc.,* 914 F.Supp. 1084 (D.N.J.1996) (Rosen, Maj. J.) (stating that federal privilege law applies in cases with both federal and state claims); *Woods v. New Jersey Dep't of Educ.,* 858 F.Supp. 51, 54–55 (D.N.J.1993) (Kugler, Mag. J.) (applying federal common law in construing attorney-client privilege); *Robinson v. Magovern,* 83 F.R.D. 79, 84–85 (W.D.Pa.1979) (invoking policy of Rule 501 that, in non-diversity cases involving both federal and state law claims, federal privilege law will generally apply to both); *Steffes v. Stepan Co.,* 144 F.3d 1070, 1074–75 (7th Cir.1998) (refusing to apply Illinois "absolute litigation privilege" in federal question case); *Auersperg v. Bulow,* 811 F.2d 136, 141 (2nd Cir.1987) ("[C]ourts have consistently held that the asserted privileges are governed by the principles of federal law"); *PPM America, Inc. v. Marriott Corp.,* 152 F.R.D. 32, 34 (S.D.N.Y.1993) ("When cases involve both federal and state claims, asserted privileges are governed by the principles of federal law").

These cases, which contain broad statements about the applicability of federal privilege law, are distinguishable from this case. For example, in many of these cases, the decision not to apply state privilege law is made because there is a competing federal privilege law that can be applied. *See, e.g., Harding,* 914 F.Supp. at 1090, 1097 (applying federal attorney-client and work product privileges); *Auersperg,* 811 F.2d at 141 (applying federal journalist privilege law). In others, the evidence for which the privilege is asserted is relevant to both the state law and federal law claims. *See, e.g., Robinson,* 83 F.R.D. at 84–85 (holding that privilege in issue was relevant to both antitrust claim and pendent state claim). In still others, there is no state-law privilege to be applied, *see, e.g., PPM America, Inc.,* 152 F.R.D. at 34 (ruling that New York statutory law does not create a state journalist privilege to compete with the federal journalist privilege), or there is only a federal claim. *See, e.g., Woods,* 858 F.Supp. at 54–55 (stating that only claims under § 1983 and the Individuals with Disabilities Education Act were in issue). Finally, in some cases the state-law privilege is not applied because there is a danger that its application would seriously undermine a federal cause of action or interest. *See, e.g., Steffes,* 144 F.3d at 1074–75. Here, however, there is no competing "federal litigation privilege." Nor is the litigation privilege in issue here relevant to the merits of the underlying federal claims: While the letters sent to Absolute's customers could be used to substantiate an unfair competition claim, they offer no proof of the validity, enforceability or the noninfringement of the '110 or '575 patents. And, most significantly, the application of New Jersey's litigation privilege here will not undermine a federal cause of action or interest.

This last point merits some discussion because it goes to the heart of the Defendants' chief argument against the application of New Jersey's litigation privilege. The Defendants contend that patent holders who want to protect their patent rights by sending notices of infringement to members of the trade must do so in good faith. There is support in the case law for this position. *See, e.g., Surgical Supply Service, Inc.,* 206 F.Supp. at 571; *Sharnay Hosiery Mills, Inc.,* 109 F.Supp. at 959; *Dynamic Instrument Corp.,* 266 F.Supp. at 851. Defendants further argue that Counterclaim Defendants' notices of in-

fringement were sent in bad faith. Enter New Jersey's litigation privilege. This privilege would thwart the bad-faith line of argument because, if applicable, it would foreclose any inquiry into the intent of the Attorney Defendants. Consistent with all absolute privileges, it protects "the bad as well as the good," *Peterson v. Ballard,* 292 N.J.Super. 575, 590, 679 A.2d 657, 664 (App.Div.1996)(citing *Hawkins v. Harris,* 141 N.J. 207, 213, 661 A.2d 284, 287 (1995)), and immunizes those whose statements are protected from an examination of their motives, morals, and intent. Consequently, the Defendants make a preemption argument, hoping to convince this Court that federal law requiring good faith trumps New Jersey's absolute litigation privilege.

This argument fails precisely because the application of New Jersey's litigation privilege does not undermine any federal interest. Defendants find support for their position in language found in *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 896 (Fed.Cir.1998), which states that "the propriety of [a patentee's] actions in giving notice of its patent rights is governed by federal statute and precedent and is not a matter of state tort law." In *Mikohn Gaming Corp.,* the Federal Circuit was reviewing a District Court decision granting a preliminary injunction against a patent holder with the effect of preventing the patent holder from informing the trade of another's infringement. *See id.* at 893–94. The party seeking the preliminary injunction, Mikohn Gaming Corp., also alleged violations of various state tort laws, including interference with existing and prospective business relations.

*See id.* Putting aside the different procedural posture of that case and that the Federal Circuit's opinion contained language indicating that its holding was limited to that procedural setting, *see id.* at 898, the Federal Circuit confined its holding to cases where there is a *conflict* between federal and state law concerning the propriety of notice letters: *"To the extent that conflict arises* in the interaction between state commercial law and federal patent law, federal law must be applied." *Id.* at 896 (emphasis added).

Just such a conflict existed in *Mikohn Gaming Corp.* The federal law, the court reasoned, required that the propriety of a notice letter be reviewed under a good faith standard while state tort law in Nevada allowed the District Court to enjoin the patent holder's notification to the trade on a much lesser showing. *See id.* at 895–97. The court held that where state law impinged upon the patent holder's federal right to protect its patent rights in good faith, the federal law's good faith standard trumped. *See id.*[12]

■ There is no such conflict in this case. As the Attorney Defendants point out, *see* Att'y Defs.' Br. Supp. Summ. J. at 21, patent holders have an undisputed right to notify the trade that their patent rights are being infringed and that they intend to protect those rights. *See Surgical Supply Service, Inc. v. Adler,* 206 F.Supp. 564, 571 (E.D.Pa.1962); *Sharnay Hosiery Mills, Inc. v. Sanson Hosiery Mills, Inc.,* 109 F.Supp. 956, 959 (E.D.Pa. 1951); *Dynamic Instrument Corp.,* 266 F.Supp. at 851. Indeed, notice is even a perquisite to obtaining damages for patent

---

12. The limits that the Federal Circuit placed on its own decision seem to square with a general concern on the part of federal courts concerning the creation of federal common law. In civil cases involving private litigants, federal courts have been reluctant to apply federal common law, even in cases involving interests created by federal law, unless there is a "significant conflict" between some federal policy and the application of the state law. Henry M. Hart, Jr. & Herbert Wechsler, *The Federal Courts and the Federal System* 780–81

(Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro eds., 4th ed.1996) (citing *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966)). Moreover, this construction of *Mikohn Gaming Corp.* is consistent with *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318 (Fed. Cir.1998) (holding that federal patent law preempts state tort law concerning notice given by patent holders only when that state tort law weakens patent holder rights).

infringement. *See* 35 U.S.C. § 287 (1994). This is the federal interest the Federal Circuit sought to protect in *Mikohn Gaming Corp.* Far from emasculating the protections afforded patent holders, the application of New Jersey's "absolute litigation privilege" only serves this interest, for even a showing of bad faith by a state tort law claimant will not subject a notice-giver to liability under the privilege. If anything, New Jersey's litigation privilege enhances patent-holder rights.[13]

The Seventh Circuit's decision in *Steffes* speaks to the relation between federal interests and the application of "absolute litigation privileges" in much the same terms.[14] Steffes had sued her employer under Title VII and the Americans with Disabilities Act contending she had been for fired because of her gender and disability. *See Steffes,* 144 F.3d at 1073–74. The employer retaliated by informing Steffes's subsequent employer about the suit and the disability. *See id.* The court concluded that applying Illinois' "absolute litigation privilege" to the comments made by Steffes's former employer would effectively prevent Steffes from bringing a claim for retaliation, which is statutorily provided for by both Title VII and the ADA. *See id.* at 1075. Unlike the *Steffes* case, the

application of New Jersey's litigation privilege in this case would not threaten a federal interest or federally provided-for right: it would amplify it.

In the end, the application of New Jersey's "absolute litigation privilege" to the facts of this case just makes sense. New Jersey has over time developed an extremely protective "absolute litigation privilege," reflecting the state's policy interest that "persons [engaged in litigation] ... be allowed to speak and write freely without the restraint or fear of an ensuing action." *Peterson,* 292 N.J.Super. at 590, 679 A.2d at 664 (citing *Hawkins,* 141 N.J. at 213, 661 A.2d at 288). Traditionally, this privilege has been applied first and foremost to protect statements made by attorneys. *See Hawkins,* 141 N.J. at 213–15, 661 A.2d at 287–88. The Defendants, alleging a state-law claim, are attempting to avoid the application of a state-law privilege even though they would have been subject to that privilege had they brought their claim in state court. Federally protected rights will not suffer by the application of the privilege in this case. Surely in a case like this a court may apply a state-law privilege. *See Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704, 707 (7th

---

**13.** While the absolute litigation privilege enhances the protection afforded patent holders, it does not leave alleged infringers defenseless against the types of warrantless, antagonistic, and damaging actions they may fear. A four-factor test must be satisfied for New Jersey's litigation privilege to apply. *See infra.* This Court is satisfied that this test offers alleged patent infringers a sufficient safe harbor. Moreover, "the privilege does not protect against professional discipline for an attorney's unethical conduct." *Hawkins,* 141 N.J. at 215, 661 A.2d at 288–89 (citations omitted). "Absolute privileges have been limited to situations in which authorities have the power ... to discipline persons whose statements exceed the bounds of permissible conduct .... [and] do not extend to statements made in situations for which there are no safeguards against abuse." *Id.* at 220–21, 661 A.2d at 290–91 (citations omitted). In this case, attorneys are accused of sending letters improperly accusing Defendants of infringing patents. Defendants can protect themselves against any impropriety "through the disci-

pline of the courts, the bar association, and the state." *Id.* at 215, 661 A.2d at 288–89 (citations omitted); *see also* Rules of Professional Conduct 4.1, 8.4 (barring the making of false statements to third parties and prohibiting engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The Attorney Defendants, apparently understanding this, have sought the appropriate remedies in Counterclaims VII and IX, alleging claims of fraud and malpractice.

Most importantly, the "absolute litigation privilege" reflects the policy choice New Jersey courts have made to encourage those " 'open channels of communication ....'[that are] 'a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings.' " *Hawkins,* 141 N.J. at 216, 661 A.2d at 289 (citations omitted).

**14.** To this Court's knowledge, *Steffes* is the only federal case to discuss in any detail the application of a state "absolute litigation privilege" in a federal question case.

Cir.1994) (applying state absolute privilege for defamation in case arising entirely under federal jurisdiction where state law issue was substantially in dispute); *Niagara Mohawk Power Corp. v. Megan–Racine Associates, Inc., (In re Megan–Racine Associates, Inc.)*, 189 B.R. 562, 569 (Bankr. N.D.N.Y.1995) (holding that Rule 501 dictates repair to state privilege law on state claims resolved in federal bankruptcy courts); *Hartsell v. Duplex Products, Inc.*, 895 F.Supp. 100, 101–03 (W.D.N.C.1995) (holding that state privilege law applies to both state and federal claims after balancing state and federal interests (citing *United States v. Cartledge*, 928 F.2d 93 (4th Cir.1991))).

Having decided that this Court has the power to apply New Jersey's litigation privilege, I must determine whether the application of the privilege ought to inoculate the Attorney Defendants against liability for the letters they sent to Sensenig and Vandergrift. This Court previously discussed the scope and requirements of New Jersey's litigation privilege extensively in *Thomason v. Lehrer*, 183 F.R.D. 161 (D.N.J.1998):

> New Jersey has recognized the litigation privilege as the backbone to an effective and smoothly operating judicial system. The litigation privilege is firmly established in New Jersey case law. The privilege protects, as absolutely immune from liability, statements by attorneys made in the course of judicial or quasi-judicial proceedings. Originally applied in defamation cases, the litigation privilege has been expanded to encompass both common-law and statutory causes of action for tortious conduct.... [The New Jersey Supreme] Court has written [that i]f the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial or quasi-judicial proceedings is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label.... The protections of the litigation privilege apply to any communication satisfying the following four re-

quirements: the communication must have been (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.

*Id.* at 166–67 (citations, internal quotations and alterations omitted, emphasis added). This privilege has also been extended to the pre-litigation context, provided that the statements to be protected are made in contemplation of litigation. *See Peterson*, 679 A.2d at 660, 664 (citing *Hawkins*, 141 N.J. at 216–22, 661 A.2d at 289–92). More specifically, pre-litigation protection has been given to "demand letters." *Kanengiser v. Kanengiser*, 248 N.J.Super. 318, 331–32, 590 A.2d 1223, 1230 (Law Div. 1991) (holding that a letter sent by an attorney demanding the payment of money owed and informing a party that his client intended to pursue arbitration was protected by New Jersey's litigation privilege). In extending the litigation privilege to demand letters, New Jersey has joined other jurisdictions. *See, e.g., Pinto v. Internationale Set*, 650 F.Supp. 306, 308–09 (D.Minn.1986) (Minnesota law); *Lerette v. Dean Witter Organization, Inc.*, 60 Cal. App.3d 573, 131 Cal.Rptr. 592, 594–95 (1976). The *Kanengiser* court cited *Lerette* in support of this extension of the privilege:

> [As a]ny competent attorney is aware, access to the courts is not an end in itself but only one means to achieve satisfaction for a client. If this can be obtained without resort to the courts— even without the filing of a lawsuit—it is incumbent upon the attorney to pursue such a course of action first. It is equally well established legal practice to communicate promptly with a potential adversary, setting out the claims made upon him, urging settlement, and warning of the alternative of judicial action. [Defendant's] letter is a typical example of such a missive.

*Kanengiser,* 248 N.J.Super. at 335, 590 A.2d at 1232 (citing *Lerette,* 131 Cal.Rptr. at 597) (citations omitted). Whether a defendant is entitled to the privilege is a question of law. *See Hawkins,* 141 N.J. at 216, 661 A.2d at 289.

The Attorney Defendants are entitled to the protection of the privilege in this case. The letters they sent were nothing more than demand letters, alleging infringement, requesting that the infringement cease, and inviting cooperation and resolution of any disputes before resort to formal suit.[15] Such letters are within the ambit of the privilege if they are sent to achieve the objects of litigation and if they have some logical relation to the litigation. *See id.* at 217–19, 661 A.2d at 290. In the Supreme Court of California's *Silberg* opinion—the decision from which New Jersey borrows much of its litigation privilege law—the court observed that these two requirements can really be folded into one, essentially requiring that the communication "not be extraneous to the action." *Silberg v. Anderson,* 50 Cal.3d 205, 266 Cal.Rptr. 638, 647, 786 P.2d 365 (1990).

The Defendants contend that the two letters in this case fall short of this threshold for three reasons: First, Waterloov's suit, even though filed within two months of sending the letters and although making reference to the '575 and '851 patents, at first only alleged infringement of the '110 patent; second, the parties to whom the letters were directed were not named as defendants until approximately four months after the letters were sent; finally, the infringement of the '575 and '871 patents was not finally pled until over a year-and-a-half after the initial pleadings were filed. *See* Defs.' Mem. Opp'n Summ. J. at 12–15, 17–18 (filed Feb. 26, 1999).

I am satisfied that these facts are not sufficient to render the letters "extraneous to the action." There is virtually no case law in New Jersey providing guidance about the circumstances in which a finding could be made that a demand letter was "extraneous." Looking to California law, as New Jersey courts often have on issues of litigation privilege, the California Court of Appeals recently held that a demand letter that never developed into a complaint could be protected by the litigation

---

**15.** The letter sent to Sensenig reads as follows and is identical to the letter to Vandergrift:

> Mr. Nelson Sensenig
> P.O. Box 936
> Ephrata, PA 17522
> Dear Mr. Sensenig:
>
> My firm, Thomason & Moser, represents Mr. Richard L. Kuhns and Waterloov, Inc. in all patent and trademark matters. Mr. Kuhns is the inventor and owner of U.S. Patent No. 5,216,851, issued June 8, 1993 and U.S. Patent No. 5,339,575, issued August 23, 1994. Each of these Patents is directed toward RAIN GUTTER COVERS AND ROOF LINE PROTECTORS. Additionally, Mr. Kuhns is the exclusive licensee of U.S. Patent 4,411,110 issued October 25, 1983. Copies of these patents are enclosed herewith.
>
> We are of the opinion that you are making, using or selling a rain gutter cover product that infringes one or more of the above Patents. It is our understanding that you are making, using or selling the infringing product through one or more of your respective companies, including Sensenig's Spouting, White Oak Manufacturing and Millway Home Improvement.

> We hereby demand that you immediately cease and desist from infringing any of these patents. Specifically, we demand that you cease and desist from making, having made, using, selling, or importing any products that infringes [sic] any of these patents. Furthermore, we hereby demand that you immediately provide to us all sales information concerning the sales of your product, including retail pricing, gross receipts, identity of purchasers and quantities ordered. This information will be used to assess the damages that you have caused our client.
>
> We suggest that you retain a Patent Attorney with complete competence in this technology area and that your Attorney contact us within thirty days. We desire to promptly bring this matter to a close. Therefore, we strongly suggest that you give this matter your prompt attention and hope that more formal proceedings will not be required to resolve this matter.
>
> Very truly yours,
> RAYMOND R. MOSER JR.
> /s/EAMON J. WALL

Decl. of Michael J. Canning, Exs. D–E (dated January 27, 1999).

privilege. *See Aronson v. Kinsella,* 58 Cal.App.4th 254, 68 Cal.Rptr.2d 305, 308–09, 316 (1997). The court ruled that the privilege could be asserted where eight months had passed since the writing of the letter and the party to whom the letter was sent sued first. *See id.* In this case the Attorney Defendants did file a suit, the parties who were the target of the letters were made parties to the suit within four months of the transmittal of the letters, and the subject matter of the suit was substantially the same as the subject matter of the demand letters. It is true that the Plaintiff's complaint at first alleged infringement only of the '110 patent, but this Court can see no reason why a party who sends a demand letter threatening suit on several grounds cannot later decide to limit the scope of the suit—much as a party who files a complaint can later dismiss one or more of the counts alleged, perhaps after discovery demonstrates the need to do so. Indeed, one of the aspirations of privileging demand letters is the resolution of disputes prior to litigation, which, if realized, would mean that suits would frequently be smaller in scope than demand letters might at first indicate. I see no reason to bind a party to all of the terms of its demand letter.[16] And while this Court has no way of divining what amount of time, if any, would render a demand letter "extraneous," I conclude that in the circumstances of this case Plaintiff's suits against Sensing and Vandergrift were brought sufficiently close in time to the transmittal of the letters such that the letters and the action did not mystically become unrelated.

In short, I find that the demand letters sent by the Attorney Defendants are consistent with the policies that support the extension of New Jersey's absolute litigation privilege to demand letters: the prompt acknowledgement and resolution of disputes. And, consistent with the overarching policies of the privilege, these letters are just the type of "opening salvo" that should be protected if parties who have been wronged are not to be chilled into inaction by their attorney's fear of personal liability. Accordingly, I shall grant summary judgment to the Attorney Defendants on the unfair competition claim. The letters sent by the Attorney Defendants cannot be used against them, and without these letters—their only evidence—the Defendants, as a matter of law, cannot make out a claim for unfair competition.

### B. *Counts VII–IX*

The allegations in Counts VII–IX of the Defendants' Answer, Affirmative Defenses and Counterclaims require the Court to turn to a set of facts different from those just considered. Defendant Knight alleges that Moser induced him to invest $16,000 in the start up of Waterloov International Corporation, a company established to market Waterloov products abroad, even though he knew or should have known that Waterloov would be unable to obtain foreign patent protection. The claims stemming from this set of facts will be discussed in turn.

### (1) *Count VII: Common Law Fraud*

■ A review of the summary judgment record persuades me that Defendants' common law fraud counterclaim should not be dismissed. To prevail on a claim of common law fraud under New Jersey law, a party must show that: (1) the defendant made a material misrepresentation of a present or past fact; (2) the defendant had knowledge of or belief in its falsity; (3) the defendant intended the claimant rely on it; (4) the claimant reasonably relied on it; and (5) damage resulted. *See Gennari,* 148 N.J. 582, 610, 691 A.2d 350, 367 (1997). A plaintiff must establish a claim of fraud by clear and convincing evidence. *See New Jersey*

---

**16.** The Defendants also argue that Waterloov has dismissed the count of its complaint alleging infringement of the '851 patent. For the reasons already stated, this Court comprehends no reason why this fact should render the letters sent by Moser any less related to this action.

*Econ. Dev. Author. v. Pavonia Restaurant, Inc.,* 319 N.J.Super. 435, 445, 725 A.2d 1133, 1139 (App.Div.1998).

### (a) Material Misrepresentation

■ To prove that Moser made misrepresentations about the availability of foreign patents, Knight must first show that international patent protection was in fact unavailable and then that Moser communicated contrary information to him.

A review of the record indicates that whether or not foreign patent protection was available at the time Knight invested in WIC remains an open question. Kuhns admits in deposition testimony that Waterloov's gutters were first in public use in December 1990. *See* Defs.' Mem. Opp'n Summ. J., Ex. 1 (filed Feb. 26, 1999). He also concedes, on the basis of information he claims has been supplied to him by Moser during the pendency of this litigation, that because his gutters were in public use before United States patent protection was filed for on October 23, 1991, his gutters are ineligible for patent protection in most foreign countries. *See id.*

As further proof that Waterloov products were in public use prior to October 23, 1991, and that, as a result, foreign patent protection was unavailable, Knight introduces correspondence exchanged between the Patent and Trademark Office ("PTO") and Moser. The PTO informed Moser and Kuhns in June 1993 that they could not receive patent protection for Waterloov gutters because a patent (the "Carey '620 patent") had already issued in March 1992 for the same invention. *See id.,* Ex. 5. To overcome the PTO's rejection, Moser argued that the gutters for which he was seeking patents were not anticipated by the Carey '620 patent because they had been reduced to practice and were in public use as early as 1990—well before the an application had been filed for the Carey '620 patent. *See id.* Moser submitted an affidavit by Kuhns attesting to this fact and a Waterloov brochure, copyrighted in 1990, showing Waterloov gutters installed and displayed on homes. *See id.* Moser's showing resulted in the withdrawal of the

PTO's rejection. *See id.* Moser's submission to the PTO now suggests that foreign patent protection has been unavailable for Waterloov products since 1990.

The Attorney Defendants counter with Moser's deposition testimony. In it Moser concedes that he was able to overcome the PTO's rejection by showing that Waterloov gutters were in public use as early as 1990. *See* Att'y Defs.' Reply Br., Ex. C (filed Feb. 26, 1999). He further argues, however, that between the time he and Kuhns persuaded the PTO to permit Waterloov to continue with its patent applications and the time the PTO actually issued the '575 patent, sufficient changes had been made both to Waterloov's gutters and to Waterloov's patent applications to render the Waterloov gutters ultimately protected substantially different from the Waterloov gutters featured in the 1990 brochure. *See id.* In other words, Waterloov gutters today, in their final, patent-protected incarnation, are different from the Waterloov gutters installed in 1990.

Needless to say, a genuine issue of material fact concerning the eligibility of Waterloov gutters for foreign patent protection remains. To determine whether Waterloov gutters were eligible for foreign patents at the time Knight invested in WIC, the significance of the installation of Waterloov gutters on homes as early as 1990 must be considered. Given the powerful evidence on both sides of this question, it must be left to trial to resolve whether Knight's or Moser's interpretation of the PTO correspondence is correct.

Putting the availability of foreign patents to one side, Moser's representations concerning this availability brings us to trickier waters. In assessing Moser's representations, we should bear in mind that just because "they may have been subtle, and made by implication and suggestion, does not change the fact that they [may have been] misrepresentations." *Miller v. American Family Publishers,* 284 N.J.Super. 67, 91, 663 A.2d 643, 656 (Ch.Div. 1995). It is not clear, however, that Moser

made any affirmative representations about the potential for foreign patent protection at all, even of the more subtle variety.

In deposition testimony and declarations, both Knight and Moser discuss a meeting they attended at Moser's office in January or February of 1994. *See* Decl. of Michael J. Canning, Ex. P; Defs.' Mem. Opp'n Summ. J., Ex. 8; Decl. of Charles Knight ¶ 7 (filed Feb. 26, 1999). Moser seems to recall little from that meeting and certainly makes no mention of any representation he made about the availability of foreign patents. *See* Defs.' Mem. Opp'n Summ. J., Ex. 8. In his own deposition testimony Knight also seems to remember little of this meeting and similarly makes no reference to any assertions by Moser about international patent protection, although it should be noted that he was never asked directly by counsel whether Moser made any such assertions. *See* Decl. of Michael J. Canning, Ex. P.

Knight tries to offer evidence of misrepresentation by introducing newsletters sent to Waterloov dealers which proclaim boldly that "Waterloov is protected by International [sic] patent protection in a majority of lucrative countries" and which give the dealers Moser's phone number to contact in case they might be interested in investing in WIC. *See* Decl. of Charles Knight, Exs. 1, 3–4. There is no indication anywhere in the record, however, that the statements made in these newsletters, sent by Waterloov, were made with Moser's authorization.

In fact, in the summary judgment record that Moser ever made any representation to Knight about the patentability of Waterloov products abroad comes from Knight's own declaration:

> "In January or early February, 1994, I met with Kuhns and Moser in Moser's office.... Although I do not know the details of Moser's explanation as it was somewhat technical and I was not famil-

iar with patent matters, Moser assured us that ... in his opinion, we could pursue foreign patent applications."

*See id.* ¶ 7. Whether or not this statement is sufficient to defeat summary judgment presents a close question, especially since in his deposition testimony Knight admits that he has difficulty recollecting statements made at the January 1994 meeting. It is not the task of this Court, however, to "weigh the evidence and determine the truth of the matter." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Especially in cases where witness credibility is crucial to the determination of a factual issue, courts should permit the issue to be tried to a jury. *See Abraham,* 183 F.3d at 285. This is just such a case, since a decision that Moser made or did not make a representation will hinge largely on whether Knight or Moser can be believed. Consequently, because a material question of fact remains concerning both the availability of patent protection and any representations Moser may have made about this availability, summary judgment cannot be granted unless it can be shown that Moser is entitled to judgment as a matter of law on one of the other elements of fraud.[17]

### (b) Knowledge of or Belief in Falsity

For reasons already outlined, a material question of fact exists concerning Moser's knowledge of the patentability of Waterloov gutters abroad. Moser claims that he did not know at the time Knight invested in WIC that Waterloov gutters had been sold to the public as early as 1990. *See* Decl. of Michael J. Canning, Ex. W. The Attorney Defendants also introduce a letter Moser wrote to Kuhns, dated October 26, 1996, relating Knight's concerns about prior use and asking Kuhns if Knight's concerns were founded. *See id.,* Ex. X. In the letter Moser tells Kuhns that he will be unable to pursue patent applications abroad and that he might have to resign as WIC's counsel if Kuhns is unable to sign

---

17. Because I find that a material question of fact exists as to whether Moser made any affirmative misrepresentations, I need not ad-

dress whether Moser could be held liable for making a fraudulent omission.

an affidavit stating that Waterloov gutters were not in use at such an early date. *See id.* The Attorney Defendants would have us believe that this is not a letter that could be penned by someone who knew about the prior use. Balanced against this evidence, however, is the PTO correspondence introduced by Knight that, without more, might reasonably be interpreted by a jury to suggest just the opposite conclusion. Consequently, what exactly Moser knew about Kuhns's sale of Waterloov gutters and what knowledge Moser had that representations he made were false is substantially in dispute.

### (c) Reasonable Reliance [18]

Even assuming, *arguendo*, that Moser made a knowing misrepresentation, the Attorney Defendants argue that Knight did not reasonably rely on such a misrepresentation. They point out through deposition testimony that Knight could not recall Moser making any representations to him about his professional experience. *See* Decl. of Michael J. Canning, Ex. P. They introduce letters written by Knight to Kuhns, dated June and September 1995, in which Knight admits that he "knew WIC was a high risk venture" *see id.,* Ex. S, and that Kuhns had made him aware that the risk in investing in WIC was so great that he should not expect a return on the investment for three to five years. *See id.,* Ex. T. The Attorney Defendants also present a copy of a "Preincorporation Agreement," signed by Knight and Kuhns, which admonishes that Kuhns could offer no guarantee that foreign patents would issue. *See id.,* Ex. V. Finally, they demonstrate that Knight was advised by his own counsel when he was considering whether or not to invest in WIC. *See id.,* Ex Z. The case the Attorney Defendants are trying to make is clear. Knight was not some unsophisticated investor, set on unequal footing because patent law can be devilishly confusing to the layman and taken advantage

of by a patent attorney capable of exploiting what we today call "information asymmetry." Rather, he was a sophisticated businessman, had sought and received the advice of his own counsel, and had been apprised of the risks of attendant to his investment. Moreover, he was fully capable of judging whether he was willing to take those risks. In short, he was too sophisticated to claim injury now because he relied on information provided to him by Moser.

Greater scrutiny of the evidence reveals, however, that the Attorney Defendants' case is by no means airtight. First, the mere fact that Knight made statements that he was aware that investing in WIC would be risky does not foreclose the possibility that he reasonably relied on misrepresentations made by Moser. All those statements indicate is that he perceived some business risk in the venture, not the degree of risk that he might have perceived had he known that foreign patents were unobtainable. Put another way, it would be reasonable to interpret Knight's comments as recognizing the risks that typically attend an investment in foreign patent rights and not the degree of risk that exists when an individual receives advice from a patent attorney who fraudulently conceals that foreign patents are unobtainable.

Moreover, despite indications that Knight was represented by counsel and that he independently investigated the soundness of investing in WIC, it is not entirely clear that Knight was in a position to ascertain that public use of Waterloov gutters as early as 1990 would stymie efforts to obtain foreign patents. While it is true under New Jersey law that "[i]n instances in which a party undertakes an independent investigation and relies on it, there can be no reliance," *Simpson v. Widger,* 311 N.J.Super. 379, 392, 709 A.2d

---

**18.** Because I find that neither party disputes whether Moser intended any reliance, I do not reach the issue. Nor need I discuss in any detail the final element of fraud, damages. Although it seems from the record that

the $16,000 Knight invested in WIC came from money his wife had been saving, *see* Decl. of Michael J. Canning, Ex. R, this Court is satisfied that the loss of the $16,000 still represented a loss for Knight.

1366, 1373 (App.Div.1998)(quoting *Byrne v. Weichert Realtors*, 290 N.J.Super. 126, 137, 675 A.2d 235, 241 (App.Div.1996)), there is a limit to this dictum. Where the scope of a party's investigation is limited such that facts fraudulently concealed by another party are not discovered, the investigating party can still be found to have relied on the other party's representations concerning those facts. *See id.* at 393–94, 709 A.2d at 1374 (citing *Golden v. Northwestern Mut. Life Ins. Co.*, 229 N.J.Super. 405, 415, 551 A.2d 1009, 1014 (App.Div.1988) Thus, in *Byrne*, where home purchasers conducted an investigation that revealed the home suffered from termite infestation, they could still be found to have relied on representations made by the sellers concerning the extent of the infestation, where the sellers knew that the infestation was great but the purchaser's investigation suggested the infestation was only minimal. *See Byrne*, 290 N.J.Super. at 136–39, 675 A.2d at 241–42. In this case, the record suggests that the attorney Knight consulted about investing in WIC was a corporate attorney. *See* Decl. of Michael J. Canning, Exs. S, Z. There is no indication that he had any special competence in patent law, that he reviewed the patent history of Waterloov gutters, or even that he attempted to give Knight any assistance beyond offering him some advice on what corporate form WIC should assume. Consequently, it would not be unreasonable to find that, despite whatever investigation he may have performed, Knight relied on representations made by Moser, at least to the extent that they concerned the acquisition of foreign patents.

Drawing all inferences in favor of the nonmoving party, enough of a factual question remains concerning any reliance Knight may have placed on representations made by Moser that the matter is best left for determination at trial.

For all of the foregoing reasons, the Attorney Defendants' motion for summary judgment on Defendants' common law fraud counterclaim is denied.

### (2) *Count VIII: New Jersey Consumer Fraud Act*

The Defendants allege that the facts that form the basis of their common law fraud claim also justify a claim under the New Jersey Consumer Fraud Act ("CFA").[19] The Attorney Defendants counter that the CFA applies neither to attorneys nor securities and that, consequently, it cannot be applied in the instant case. *See* Att'y Defs.' Br. Supp. Summ. J. at 33. While this Court finds the arguments made by the Defendants in support of this claim intriguing, I must agree with the Attorney Defendants that the CFA does apply to the facts in this case. Because there is no genuine issue for trial, the Attorney Defendants are entitled to judgment as a matter of law on this claim.

██ I do *not* ground my decision in any *per se* exclusion of attorneys from coverage under the CFA. In New Jersey, there has been a longstanding assumption that just such an exemption exists for professionals. After likening real estate brokers to lawyers, doctors, and accountants, the New Jersey Superior Court, in *Neveroski v. Blair*, 141 N.J.Super. 365, 379, 358 A.2d 473, 480–81 (App.Div.1976), explained:

> Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders "services" to the public

---

19. The New Jersey Consumer Fraud Act reads, in relevant part:

 The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such a person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....

 N.J. Stat. Ann. § 56:8–2 (West, WESTLAW through L.1999, c. 61).

.... it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.

The *Neveroski* court found it significant in reaching this conclusion that professionals are typically regulated independently of the CFA. *See id.* at 379, 358 A.2d at 480.

"The history of the Act has been one of constant expansion," however. *Gennari v. Weichert Co. Realtors,* 148 N.J. at 604, 691 A.2d at 364. The *Neveroski* opinion, for example, has been superceded by a 1975 amendment to the CFA placing real estate transactions within the ambit of the CFA and thereby rendering real estate agents subject to liability under the Act. *See Blatterfein v. Larken Associates,* 323 N.J.Super. 167, 176–77, 732 A.2d 555, 560–61 (App.Div.1999). Moreover, the Supreme Court of New Jersey has questioned the rationale articulated in *Neveroski* that professionals are beyond the pale of CFA regulation because they are regulated independently, stating,

> In determining whether the existence of other regulations creates an exemption to the CFA for particular conduct that otherwise would fall within its provisions, it should ordinarily be assumed that the CFA applies to the covered practice.... In order to overcome [this presumption], a court must be satisfied that ... a direct and unavoidable conflict exists between the application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity.... [T]he conflict must be patent and sharp....

*Lemelledo v. Beneficial Management Corp. of America,* 150 N.J. 255, 270, 696 A.2d 546, 554 (1997); *see also Doug Grant, Inc. v. Greate Bay Casino Corp.,* 3 F.Supp.2d 518, 536–37 (D.N.J.1998) (applying the *Lemelledo* standard and holding that gaming regulations in New Jersey are so pervasive that the CFA did not apply to an action against New Jersey casinos). As a result of the broadening of the applicability of the CFA, it has been applied to professionals in ways the *Neveroski* court once thought unthinkable. *See, e.g., Gilmore v. Berg,* 761 F.Supp. 358, 375–76 (D.N.J.1991) (ruling that the CFA may be applied to an accountant and an attorney); *Lemelledo,* 150 N.J. at 273, 696 A.2d at 555 (holding that the CFA is applicable to a financial services company); *Blatterfein,* 323 N.J.Super. at 182, 732 A.2d at 564 (ruling that the CFA is applicable to architects). *But see Vort v. Hollander,* 257 N.J.Super. 56, 61–62, 607 A.2d 1339, 1342–43 (App.Div.1992) (ruling that lawyers are not covered by the CFA). The once foundational, if haughty, precept that professionals are exempt from the CFA simply because they are professionals is seemingly being abandoned, as many bright-line rules are, for a more complicated calculus. For this reason, Defendants' contention that the CFA is applicable to the Attorney Defendants in this case is not baseless.

 Nonetheless, summary judgment must be granted to the Attorney Defendants as a matter of law not because they are attorneys and therefore *per se* immune to liability under the CFA, but rather because the transaction between the Attorney Defendants and the Defendants is not of the type covered by the CFA. While professionals do not seem to be *per se* exempt from the CFA they do not seem to be *per se* covered, either. *See Vort,* 257 N.J.Super. at 62, 607 A.2d at 1342 (pointing out that the New Jersey Legislature has not amended the CFA to cover professionals generally despite the historical resistance of New Jersey courts in applying the Act to professionals). Discerning whether or not a professional is subject to the CFA in a particular circumstance will depend on a number of factors including the degree and type of regulation that a professional's activities are subject to outside of the CFA and the type of transaction involved.[20]

---

20. Because this decision rests on the type of

transaction that took place between the De-

An analysis of New Jersey case law reveals that a substantial fault line divides cases addressing the application of the CFA to professionals. On the one side are cases involving underlying transactions clearly within the ambit of the CFA. In these cases, New Jersey courts have been willing to extend liability to professionals. For example, since the New Jersey Legislature amended the CFA to cover the sale and advertising of real estate, courts have been willing to hold professionals responsible for services offered in connection with the sale and advertisement of real estate.

*See, e.g., Gilmore,* 761 F.Supp. at 375–76 (attorneys and accountants); *Blatterfein,* 323 N.J.Super. at 182, 732 A.2d at 564 (architects). On the other side, where the underlying transaction is not covered by the CFA, courts have refused to extend liability. *See, e.g., Vort,* 257 N.J.Super. at 62–63, 607 A.2d at 1342–43 (refusing to apply the CFA to an attorney where the lawyer was accused of malpractice through overbilling).

The Attorney Defendants contend that the underlying transaction in this case was

fendants and the Attorney Defendants, I need not discuss the scope and character of the regulation of lawyers in New Jersey. It is worth noting, however, the potential impact of the New Jersey Supreme Court's decision in *McKeown–Brand v. Trump Castle Hotel & Casino,* 132 N.J. 546, 626 A.2d 425 (1993) on this issue. In *McKeown–Brand* the New Jersey Supreme Court declared unconstitutional a statutory provision permitting prevailing parties in a litigation to recover attorney's fees from the nonprevailing party in the event that the nonprevailing party filed a frivolous claim or defense. *See id.* at 556–58, 626 A.2d at 430–31. The court believed the provision to be tantamount to a regulation of the conduct of lawyers and ruled that the New Jersey Supreme Court alone has the exclusive power to regulate attorney conduct pursuant to Article IV, section II, paragraph 3 of the New Jersey State Constitution. *See id.* Despite the *McKeown–Brand* court's strong rhetoric, however, it is not clear that the New Jersey Legislature is entirely preempted from passing constitutionally valid consumer fraud regulations that touch upon the regulation of lawyers. The court admitted in *McKeown–Brand* that depending upon "the legitimacy of the Legislature's purpose and on the extent of the encroachment of the statute on judicial prerogative and interests" the New Jersey Supreme Court will tolerate the regulation of lawyers by the legislature. *Id.* Indeed, in *Knight v. Margate,* 86 N.J. 374, 431 A.2d 833 (1981), the court tolerated just such a legislative regulation, holding that a statutory provision amending the New Jersey's Conflicts–of–Interest Law as it affects judges was constitutional. *See id.* at 390–95, 431 A.2d at 841–45. Thus, it seems that *McKeown–Brand* and *Knight* do not preclude the regulation of lawyers through the CFA. Rather, the analysis in these cases echoes the analysis in *Lemelledo* in some respects. The key issue in both instances seems to be the degree to which a consumer fraud regulation conflicts with other regulations governing the same profession-

al activity. The New Jersey Supreme Court upheld the constitutionality of the provision in *Knight* because it found the provision "generally consistent with the purpose, theme and spirit of the ethical strictures upon judicial conduct imposed by the ordinary rules of judicial ethics," *see Knight,* 86 N.J. at 393, 431 A.2d at 843, while it found the provision at issue in *McKeown–Brand* unconstitutional because it created a direct conflict with the rules promulgated by the Supreme Court in the state Rules of Professional Responsibility. *See McKeown–Brand,* 132 N.J. at 556–58, 626 A.2d at 430–31.

I find it unnecessary in this case to venture into an analysis of the degree to which the CFA, in the manner in which it is pled in this case, encroaches on judicial prerogatives and interests. I merely point out that this case presents a special wrinkle because the Defendants essentially contend that the CFA should be applied to Attorney Defendant Moser not simply in his capacity as a lawyer, but in his capacity as an investor in WIC as well. *See* Defs.' Mem. Opp'n Summ. J. at 33. There is support in New Jersey case law for the proposition that liability under the CFA should be imposed on professionals precisely in the instances in which they wear more than one hat. *See, e.g., Blatterfein,* 323 N.J.Super. at 182, 732 A.2d at 564 (holding an architect liable under the CFA because he participated in the selling and marketing of the real estate in dispute as well as its design). Moreover, to the degree that Moser has violated any ethical norms (the Defendants allege Moser made misrepresentations concerning WIC's ability to obtain patents abroad—a potential ground for discipline under Rules 4.1 and 8.4 of the Rules of Professional Conduct), it is an open question whether the application of the CFA to this conduct would represent a regulation "generally consistent with the purpose, theme and spirit of the ethical strictures ... imposed by the ordinary rules of [attorney] ethics."

a securities transaction. *See* Att'y Defs.' Br. Supp. Summ. J. at 33. The Defendants counter that it was something else, arguing that they could not receive stock in a yet unformed company and that they were entitled, quite apart from stock, to a stream of income from the licensing or sale of inventions in foreign countries. *See* Defs.' Mem. Opp'n Summ. J. at 31–32. The parties dispute the construction of Defendant Knight's compensation vigorously because it has been decided conclusively that securities do not fall within the ambit of the CFA. *See Stella v. Dean Witter Reynolds, Inc.*, 241 N.J.Super. 55, 75, 574 A.2d 468, 478 (App.Div.1990).

Even if this Court were to agree with the Defendants that Knight's compensation in the WIC transaction amounted to something other than securities, this Court would still find that the transaction was one not within the ambit of the CFA. The CFA regulates fraud "in connection with the sale or advertisement of any merchandise or real estate." N.J. Stat. Ann. § 56:8–2. None of the parties in this action contend that the sale of an interest in WIC to the Defendants constituted real estate. As a result, Defendants' interest must fall within the definition of "merchandise" for the CFA to apply.

"Merchandise" is defined as "any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann. § 56:8–1(c). While New Jersey courts have not decided whether a financial stake of the variety involved in this case is "merchandise," there is some evidence that New Jersey courts would conclude it is not. In *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259 (3rd Cir.1994), the Third Circuit concluded that a franchise in a California Smoothie restaurant did not constitute "merchandise" within the meaning of the CFA. The court performed an extensive review of New Jersey case law and legislative history and concluded that "the [CFA] ... was intended to protect persons engaging in 'consumer' transactions, not those acquiring businesses." *Id.* at 1272.

New Jersey courts, the Third Circuit argued, have construed the CFA's definition of the term "merchandise" " 'under the doctrine of *ejusdem generis* as a comprehensive definition intended to incorporate other products or services similar in nature to those enumerated by the specific words' " of the definition. *Id.* at 1272–73 (citing *Neveroski*, 141 N.J.Super. at 379, 358 A.2d at 480). A franchise, the court contended, is nothing like "objects, wares, goods, commodities, [or] services." *See id.* Moreover, a franchise does not resemble any of the items identified by the New Jersey Division of Consumer Affairs (automobile parts, meat, health clubs, etc.) to be "merchandise" within the meaning of the CFA. *See id.* at 1274 (citing *BOC Group, Inc. v. Lummus Crest, Inc.*, 251 N.J.Super. 271, 280, 597 A.2d 1109, 1112–13 (Law Div.1990)). The Third Circuit concluded that a franchise fundamentally was not a consumer good:

> [e]ven where franchises or distributorships are available to the public at large in the same sense as are trucks, boats or computer peripherals, they are not covered by the [CFA] because they are businesses, not consumer goods or services. They never are purchased for consumption. Instead they are purchased for the present value of the cash flows they are expected to produce in the future....

*Id.*

Based upon the Third Circuit's persuasive analysis of New Jersey case law, I hold that the Defendants' stake in WIC was not "merchandise." The Defendants made an investment in WIC anticipating a stream of payments, in the form of stock distributions or otherwise, as a return on their investment. Because this type of transaction is not contemplated by the CFA, the Defendants are not entitled to relief under the Act as a matter of law and the Attorney Defendants are entitled to summary judgment on the CFA claim.

**(3)** *Count IX: Legal Malpractice*

The final claim to be addressed on this summary judgment motion is whether any of Moser's actions constitute attorney malpractice. The Defendants claim they do, arguing that Moser either knew or should have known that foreign patent protection was unavailable and that, if he did know, he should have informed Knight. *See* Defs.' Mem. Opp'n Summ. J. at 33–34. The Attorney Defendants move for summary judgment claiming that Moser owed no duty to Knight, that the Defendants have neither presented the required expert testimony nor sufficient facts to prove Moser's negligence, and that the necessary "affidavit of merit" has not been filed. *See* Att'y Defs.' Br. Supp. Sum. J. at 34–36.[21] Because this Court agrees with the Attorney Defendants that Knight and Absolute have not introduced the requisite expert testimony, the Defendants' malpractice claim shall be dismissed.[22]

To prevail on a claim of legal malpractice, a plaintiff must prove the existence of an attorney-client relationship that gives rise to a duty of care, the breach of such duty, and proximate causation. *See DeAngelis v. Rose*, 320 N.J.Super. 263, 274, 727 A.2d 61, 67 (App.Div.1999). Generally speaking, a lawyer is required to exercise that "degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise." *St. Pius X House of Retreats v. Camden Dioc.*, 88 N.J. 571, 588, 443 A.2d 1052, 1060–61 (1982). It is the plaintiff's obligation to demonstrate what this standard means in a particular circumstance, for it is settled law in New Jersey that a party who brings a malpractice claim is required to present expert testimony that establishes the standard of care against which the defendant's actions are to be measured. *See Rosenberg v. Cahill*, 99 N.J. 318, 325, 492 A.2d 371, 374 (1985); *Sommers v. McKinney*, 287 N.J.Super. 1, 10–11, 670 A.2d 99, 104 (App.Div.1996); *Aldrich v. Hawrylo*, 281 N.J.Super. 201, 214, 656 A.2d 1304, 1311 (App.Div.1995); *Brizak v. Needle*, 239 N.J.Super. 415, 431–32, 571 A.2d 975, 984 (App.Div.1990). Exceptions to the expert testimony requirement may be made, however, where a defendant's actions present such an obvious breach of an equally obvious professional norm that jurors could resolve the dispute on the basis of their own ordinary knowledge and experience and without repair to technical or esoteric information. *See Rosenberg*, 99 N.J. at 325, 492 A.2d at 374–75; *Sommers*, 287 N.J.Super. at 10–11, 670 A.2d at 104; *Aldrich*, 281 N.J.Super. at 214, 656 A.2d at 1311; *Brizak*, 239 N.J.Super. at 431–32, 571 A.2d at 984.

This case does not fall within that category of cases that are so straightforward in nature that expert testimony is not required. New Jersey courts have dispensed with the expert testimony requirement in cases where attorneys have failed to fulfill the most basic obligations. *See, e.g., Sommers*, 287 N.J.Super. at 8–12, 670 A.2d at 103–105 (no expert required where lawyer failed entirely to submit a legal argument in client's defense); *Bri-*

**21.** Short work can be made of Attorney Defendants' complaint that the Defendants have failed to file an affidavit of merit. Under New Jersey law, a party who brings an action for malpractice is required, within 60 days of a defendant's filing of an answer, to provide the defendant with an affidavit, signed by someone in the defendant's field, stating that a reasonable probability exists that the defendant committed malpractice. *See* N.J. Stat. Ann. § 2A:53A–27 (West, WESTLAW through L.1999, c. 61). The Supreme Court of New Jersey has held, however, that the New Jersey Legislature intended this provision to apply only in actions whose underlying legally sig-nificant facts occurred after the effective date of the statute, June 29, 1995. *See Alan J. Cornblatt, P.A. v. Barow*, 153 N.J. 218, 229, 236, 708 A.2d 401, 406, 410 (1998). The facts critical to determining malpractice in this case occurred in April 1994 when Knight decided to invest in WIC on the basis of Moser's alleged representations. Consequently, the affidavit of merit requirement is simply inapplicable.

**22.** Because I dismiss this claim on this ground, I do not reach the parties' contentions concerning any duty Moser may have owed Knight and Absolute.

*zak,* 239 N.J.Super. at 431–32, 571 A.2d at 984 (no expert needed where attorney failed to protect client's claim against the running of the statute of limitations); *Stewart v. Sbarro,* 142 N.J.Super. 581, 591–92, 362 A.2d 581, 587 (App.Div.1976) (expert testimony unnecessary where lawyer sacrificed client's creditor priority by failing to ensure that a bond and mortgage were properly recorded). A common thread runs through these cases in that none of them required the trier of fact to armchair-quarterback an attorney's legal judgment concerning a complex legal issue. Where a trier of fact would be put in such a position, New Jersey courts have required expert testimony to be presented. *See, e.g., Aldrich,* 281 N.J.Super. at 214–15, 656 A.2d at 1311 (holding that expert testimony was required where attorney told sellers of property that they did not need to disclose zoning restriction to buyers because the attorney reasoned that the restriction was invalid).

In this case, a jury would be asked to make a complex legal judgment. To determine whether Moser acted negligently in his dealings with Knight, the jury would have to appraise Moser's opinion concerning the impact amendments to Waterloov's United States patent applications would have on foreign patentability. Specifically, the jury would have to determine whether Moser violated his duty of care in concluding that foreign patent protection was available when WIC was formed in 1994 because Waterloov gutters were at that time different from those that had been disclosed to the public in 1990. Such a determination would require that the jury analyze, first and foremost, the correspondence exchanged between Moser and the PTO. It demonstrates no lack of respect for the abilities and wisdom of our country's jurors to conclude in this case that these matters are "so esoteric," *see Sommers,* 287 N.J.Super. at 10, 670 A.2d at 104, and beyond the ken of everyday experience that expert testimony is required.

That being said, the Defendants have not offered a legally sufficient expert opinion. While they have filed a declaration of a patent attorney and former examiner at the PTO, *see* Decl. of Martin L. Faigus (filed Feb. 26, 1999), I find that it fails to create a material question of fact and amounts to little more than a general overview of patent law. Faigus makes only one direct reference to the facts of this case:

> I have been advised that the original application that matured into the patents at issue in the present lawsuit was filed. in the United States Patent and Trademark Office on October 23, 1991.... Based on this information, it is my opinion that ... [n]o valid patent could ·be obtained under the European Patent Convention if the invention had been described in a printed publication anywhere in the world or otherwise had been publicly disclosed anywhere in the world prior to October 23, 1991....

*Id.* ¶ 11. Faigus concludes that patent protection could not be obtained in Canada and Australia for the same reasons. *See id.* Faigus does not address the possibility, however, that the Waterloov gutters that were publicly disclosed prior to October 23, 1991, were different from the devices for which Waterloov ultimately received patent protection. Indeed, there is no indication that Faigus is at all familiar with what has become a critical piece of evidence in this case: the correspondence between Moser and the PTO. He does not discuss what a patent attorney's duty of care is generally, and he certainly does not establish what Moser's duty of care should have been in this case. Faigus does not offer an opinion as to whether Moser breached any standard of care by failing to recognize that prior public disclosure would thwart foreign patent filings or by failing to disclose to Knight that prior disclosure reduced the likelihood that foreign patent protection would be obtained. He also does not examine whether Moser's alleged breach of a patent attorney's duty of care was the proximate cause of the Defendants' injuries. In short, the opinion does nothing that an expert opinion is supposed to do in these circumstances, i.e.,

offer a critical opinion based on an assessment of specific facts as to whether an attorney breached his professional duty thereby causing another injury. Rather, Faigus's Declaration offers a bare-bones discussion of how novelty requirements could be relevant to the outcome of this case based on similarly naked assumptions.

A failure to provide legally sufficient expert testimony proves fatal to the Defendants' legal malpractice claim on this motion for summary judgment. When a malpractice defendant moves for summary judgment pursuant to Rule 56 and avers facts alleging that his actions are not negligent, the burden of production shifts to the plaintiff to proffer evidence that would create a genuine issue of material fact as to the standard of care. *See Gans v. Mundy*, 762 F.2d 338, 343 (3rd Cir.1985). Where state law requires that the plaintiff establish the standard of care with expert testimony, the plaintiff must produce expert testimony to resist summary judgment. *See id.* Moser has alleged sufficient facts that his acts were not negligent. The expert testimony provided by the Defendants does not establish what Moser's duty of care was under the circumstances of this case. Consequently, the expert testimony the Defendants provide does not create a material question of fact, and summary judgment on the Defendants' malpractice claim is granted.[23]

The Defendants contend that it is "absurd" that they be expected to produce expert testimony at this juncture and that they know of no requirement that mandates that expert evidence be submitted to resist a motion for summary judgment. *See* Defs.' Mem. Opp'n Summ. J. at 34. The Third Circuit's opinion in *Gans* is dispositive of the Defendants' apparent consternation. Moreover, this Court recently analyzed the necessity for expert testimony in a legal malpractice case governed by New Jersey law in the summary judgment context. *See RTC Mortgage Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Company*, 58 F.Supp.2d 503, 519, 523–29 (D.N.J.1999). That case is relevant to this one in two respects. First, it provides an example of the type of circumstances in which expert testimony is not needed to resist a motion for summary judgment. *See id.* at 524. In that case, two real estate developers received a loan from a federal savings and loan. *See id.* at 510. The savings and loan extended the loan because it believed that it acquired a first priority lien on the developers' property as security. *See id.* The savings and loan relied on an opinion letter, drafted by the developers' attorney, that opined that the savings and loan's mortgage constituted a first priority lien. *See id.* Malpractice was alleged, however, because the same attorney who wrote the opinion letter had previously arranged for and recorded a second mortgage on that same property as security for a loan made by another financial institution. *See id.* The attorney admitted in deposition testimony that he knew or should have known that he had recorded the other mortgage. *See id.* at 524. I held that an expert was not needed to inform a jury that an attorney should not make statements he knew or should have known to be untrue in an opinion letter. *See id.* That case is obviously distinguishable from this one, however. In this case, the evidence is not nearly as compelling that what Moser knew about the prior use of Waterloov gutters so clearly indicated the unavailability of foreign patents that he should have: (1) recognized this fact; and (2) disclosed it.

23. While I grant the Attorney Defendants' motion for summary judgment on the legal malpractice claim because the Defendants have failed to proffer legally sufficient expert testimony, I also note that Faigus's opinion suffers from additional, procedural defects. It was submitted beyond the deadline established for the submission of such evidence, October 30, 1998. *See* Am. Scheduling Order (filed Sept. 1, 1998). Moreover, the form of the opinion does not comport with some of the requirements of the Federal Rules of Civil Procedure. For example, it does not include a statement of the compensation Faigus received for assembling his report. *See* Fed. R.Civ.P. 26(a)(2)(B).

Second, although I held that expert testimony was not required to resist a motion for summary judgment in the *RTC Mortgage Trust* case, I did not rule that expert testimony is never required in opposing a motion for summary judgment. Indeed, it would be difficult to reach such a conclusion given the great number of New Jersey cases that have examined the necessity and sufficiency of expert opinions in the summary judgment context. *See, e.g., Rosenberg,* 99 N.J. at 324–27, 492 A.2d at 374–75; *Sommers,* 287 N.J.Super. at 9–14, 670 A.2d at 103–05; *Aldrich,* 281 N.J.Super. at 204, 206, 213–15, 656 A.2d at 1305, 1307, 1311; *Vort,* 257 N.J.Super. at 60–61, 607 A.2d at 1341–42.

## V. CONCLUSION

For the reasons set forth above, the motion of the Attorney Defendants, Charles Lee Thomason, Raymond R. Moser, Jr., Emon J. Wall, and Thomason & Moser, for summary judgment is granted in part and denied in part. Specifically, I find that the Attorney Defendants' are entitled to judgment as a matter of law on the Defendants' unfair competition claim because New Jersey's "absolute litigation privilege" insulates the Attorney Defendants from liability for the notices of infringement they sent to Absolute's customers. As a result, the Attorney Defendants' motion for summary judgment on the unfair competition claim is granted. I shall also grant the Attorney Defendants' motion for summary judgment on the Defendants' New Jersey Consumer Fraud Act claim because I find that, as a matter of law, the CFA is not applicable to the type of investment made by the Defendants in WIC. In addition, I find that a material question of fact does not exist concerning Defendants' legal malpractice claim because the Defendants have not produced expert testimony that creates a genuine material question of fact as to the standard of care that Moser should have exercised in this case. I shall therefore grant the Attorney Defendants' motion for summary judgment on the Defendants' legal malpractice claim.

I shall deny, however, the Attorney Defendants' motion for summary judgment on the Defendants' common law fraud claim. I find that a material question of fact exists as to whether: (1) Waterloov gutters were ineligible for foreign patents; (2) Moser made misrepresentations about whether foreign patent protection was available; (3) Moser knew that any representations he made concerning the availability of foreign patent protection were false; and (4) Knight relied on Moser's alleged representations in deciding to invest in WIC. Accordingly, the Attorney Defendants' summary judgment motion is denied on the Defendants' common law fraud claim.

The Court will enter an appropriate order.

## ORDER

This matter having come before the Court on the motion of Additional Counterclaim Defendants Charles Lee Thomason, Raymond R. Moser, Jr., Emon J. Wall, and Thomason & Moser (collectively "Attorney Defendants"), for summary judgment, Michael J. Canning, Esq., Giordano, Halleran & Ciesla, P.C., appearing on behalf of Attorney Defendants, and Norman E. Lehrer, Esq., and Vanitha M. Elgart, Esq., Norman E. Lehrer, P.C., appearing on behalf of Defendants, Absolute Gutter Protection, L.L.C., and Charles Knight; and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 28th day of September, 1999, hereby ORDERED that the motion for summary judgment of the Attorney Defendants is GRANTED in part and DENIED in part as follows:

1. The motion for summary judgment of the Attorney Defendants is GRANTED with respect to the unfair competition claim (Count IV) asserted by De-

fendants, Absolute Gutter Protection, L.L.C., and Charles Knight;

2. The motion for summary judgment of the Attorney Defendants is GRANT-ED with respect to the New Jersey Consumer Fraud Act claim (Count VIII) asserted by Defendants, Absolute Gutter Protection, L.L.C., and Charles Knight;

4. The motion for summary judgment of the Attorney Defendants is GRANT-ED with respect to the legal malpractice claim (Count IX) asserted by Defendants, Absolute Gutter Protection, L.L.C., and Charles Knight; and,

5. The motion for summary judgment of the Attorney Defendants is DENIED with respect to the common law fraud claim (Count VII) asserted by Defendants, Absolute Gutter Protection, L.L.C., and Charles Knight.